IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                               No. 1:14-cr-179-MC

       v.

                                            **ORDER**

GIOVANI FRANCISCO ABARZA,
JOSEPH SANTINO DIBRITO, LISA
RENEE ABARZA,

        Defendants.

_____

**MCSHANE, J.**

      Defendant Giovani Abarza (Abarza) moves to suppress evidence seized as a result of a traffic stop in Klamath Falls, Oregon.  At issue is whether Oregon State Police troopers unreasonably prolonged the traffic stop.  Because the troopers lacked reasonable suspicion to continue the traffic stop, and because Abarza did not voluntarily consent to the searches of his person or his vehicle, I grant the motion to suppress.

<strong>BACKGROUND</strong>

<strong>ABARZA IS STOPPED FOR FAILURE TO SIGNAL A LANE CHANGE</strong>

      The night of Thursday, March 6, 2014, Oregon State Police Trooper (now Detective) David Chambers was patrolling Klamath Falls, Oregon, in a marked police vehicle.  At about 11:45 p.m., Chambers noticed a maroon Acura Integra pull into a closed Chevron gas station on Washburn Way, a five-lane street.  Chambers could see two people in the Acura.  Abarza was driving the Acura, and co-defendant Joseph Dibrito was in the front passenger seat.

Chambers watched for a few moments as the Acura parked and turned off its headlights, while no one left or entered the car.  The Acura's headlights then turned back on and the car moved towards the parking lot driveway, preparing to turn left onto Washburn Way.  Chambers decided to follow the Acura to investigate why it was parked late at night in a closed gas station.

Chambers drove south on Washburn Way, past the Chevron station where the Acura was waiting to exit.  After Chambers passed the gas station, the Acura, turned left onto Washburn Way and went into the far right lane.  Chambers turned into the Chevron station and then turned left to follow the Acura southbound on Washburn Way.  Chambers determined he had reasonable suspicion to pull over the Acura for failure to signal a lane change on Washburn Way when the Acura drove from the left lane to the far right lane.

In evidence is Chambers's dash-cam video of the traffic stop.  The dash cam was not pointed toward the Acura while Chambers was turning around in the Chevron parking lot, so it did not record the lane-change violation.  The dash-cam video shows the Acura signaling a right turn from Washburn Way to Onyx Avenue.  Chambers asked another Oregon State Police Trooper on patrol, Sergeant Cliff Barden, to provide back-up. After the Acura completed the turn onto Onyx Avenue, Chambers turned on his overhead lights to initiate a stop.  Barden's police vehicle was driving directly behind Chambers's vehicle.

At the suppression hearing, Chambers testified that he often observed similar lane-change violations, but admitted he rarely stops drivers for such minor infractions. Because he believed the Acura's occupants were acting suspiciously, he used the minor traffic violation to seek evidence of a more serious offense.  Pretextual stops are legitimate tools for law enforcement so long as the officer has an objectively reasonable suspicion that a traffic violation occurred.

PAGE 2 - ORDER

*United States v. Choudhry*, 461 F.3d 1097, 1102 (9th Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806, 819 (1996)).

The dash-cam video has been very useful to my findings on the circumstances of this traffic stop. The dash-cam video includes audio (some of which is from Chambers's body microphone) starting the moment Chambers turned on his overhead lights until the end of the traffic stop more than an hour later. The video starts, without sound, about a minute before Chambers turns on his overhead lights.

Onyx Avenue is a narrow street with no shoulder and high curbs. To stop safely, a car must turn off of the road into one of the parking lots that open out onto Onyx Avenue. The first available parking lot is on the right-hand side of the road and is situated very close to Washburn Way. That parking lot services a Taco Bell restaurant. Although the government contends Abarza should have pulled over into the Taco Bell parking lot, I conclude that Abarza did not have sufficient time to safely turn into that parking lot after Chambers turned on his lights. Onyx Avenue then continues for a short distance before opening up on two large parking areas, one to the right, which also services the Taco Bell, while the left-hand parking lot services a small complex of other shops.

After Chambers turned on his lights, Abarza proceeded slowly down Onyx Avenue before turning into the left-hand parking lot and coming to a stop in a parking space. Chambers stopped his patrol vehicle behind and to the right of the Acura. Because of the angle of Chambers's patrol car, the dash cam is pointed away from the Acura and towards a nearby Wal-Mart. Barden drove his patrol car around Chambers and brought his car to a halt at a perpendicular angle to the Acura. The front end of Barden's patrol car is visible in Chambers's

dash-cam video.  Although Barden's patrol car was better positioned to capture video of the stop,
Barden did not turn on his lights and so no dash-cam video was preserved from his patrol car.

After hearing the testimony and viewing the dash-cam video, I find that Chambers and
Barden overstated the circumstances of this traffic stop.  Specifically, Chambers described the
location of the traffic stop as a high-crime area; the troopers described Abarza's conduct in
pulling over as a "slow elude"; Chambers described Abarza as very nervous and fidgety; and the
troopers testified that they detected the odor of marijuana emanating from the Acura.

**High-Crime Area:**  The Ninth Circuit warns courts that "the citing of an area as 'high-
crime' requires careful examination by the court."  *United States v. Montero-Carmargo*, 208
F.3d 1122, 1138 (9th Cir. 2000) (en banc).  This court "must be particularly careful to ensure that
a 'high crime' area factor . . . is limited to specific, circumscribed locations where particular
crimes occur with unusual regularity."  *Id.* (high-crime designation has been used as a proxy for
race or ethnicity).

Here, Chambers testified that the Acura was parked in "an area where a lot of drug
transactions have taken place." He testified that "all of the businesses are closed" and that "this
entire block is closed."  Chambers mentioned a house where drug deals occurred in a nearby
residential neighborhood.  The government did not, however, present evidence connecting
Abarza or Dibrito to the alleged "drug house."  Nor did the government present evidence on the
number of arrests in the area or other objective evidence of unusually frequent criminal activity.
"A lot of drug transactions" by itself does not define the regularity, the number, or the time in
which the criminal activity occurred.

Given the lack of objective evidence provided by the government, and based on my
viewing of the dash-cam video and other evidence, I find that the traffic stop occurred in a mixed

commercial and industrial area on a reasonably busy, well-lit street. At 11:50 p.m. on a weeknight, several businesses were in fact open within a block of where Chambers first noticed the Acura. These businesses include an alcohol-free video gambling establishment, a Taco Bell, and a 24-hour Wal-Mart. The dash-cam video shows customers at the Taco Bell and dozens of vehicles entering and exiting the Wal-Mart parking lot. There do not appear to be taverns or bars in the immediate area. I find the government has not shown that the encounter took place in a high-crime area.

**Abarza's Slow Pull-Over:** Chambers described Abarza as being "very slow" to pull over after Chambers turned on his overhead lights. He testified that Abarza did not avail himself of the first opportunity to pull over. Barden described Abarza's conduct as a "slow elude." Considering the dash-cam video and the testimony of defense witness Holly Lidey, a former Oregon State Police Trooper, I find that Abarza pulled over promptly under the circumstances at the first reasonably available parking spot. The video shows that Abarza parked no more than 25 seconds after Chambers turned on the overhead lights, about 340 feet from intersection of Washburn and Onyx Avenue. Contrary to the testimony of Chambers, Abarza did not have an opportunity to pull into the Taco Bell parking lot. When Chambers activated the overhead lights, Abarza was in a narrow lane with no shoulders, in which all witnesses agree Abarza was unable to do anything other than move forward. Abarza took the first opportunity to stop when he emerged from the narrow lane by pulling directly into one of the closest parking stalls in the parking lot that was now available to him.

Given the overstatement of the Acura's "slow elude" in pulling over, I am hesitant to accept the contemporary observations made by the troopers that the occupants of the car were making "a lot of furtive movements." While it is hard to see on the dash-cam video what the

occupants are doing as the car is being pulled over, I will accept that some furtive movement took place.

**Abarza Acting Nervous:** Chambers testified that Abarza seemed to be very nervous and fidgety during the traffic stop.  Although a person's nervousness is relevant to reasonable suspicion, "'standing alone'" it carries "little weight because many citizens become nervous during a traffic stop, even when they have nothing to hide.'"  *United States v. Evans*, No. 3:13-cr-00079-LRH-WGC, 2015 WL 4711148, at *6 (D. Nev. Aug. 7, 2015) (*Evans II*) (quoting *State v. Beckman*, 305 P.3d 912, 918 (Nev. 2013) (citing *United States v. Arvizu*, 534 U.S. 266, 275 (2002)).

Based on the dash-cam audio and the testimony of Oregon State Police Trooper Patrick Irish, I find that Abarza was not so remarkably nervous as to give rise to reasonable suspicion. Trooper Irish, who stood next to Abarza during the search of the Acura, testified that Abarza was "pretty calm," "nonchalant," and conversing casually with Irish.  I note that Irish, who is trained to recognize drug or alcohol intoxication, testified he "did not notice" that Abarza showed "any signs of impairment."  Throughout the troopers' testimony, Abarza is either nervous or casual depending on how the situation suits the troopers.  He is nervous if nervousness supports a safety concern and he is casual and conversational when such attributes support his voluntary consent.

I will address the marijuana odor when I discuss whether the troopers had reasonable suspicion to extend the stop.

### THE TRAFFIC STOP AND SEARCHES OF DEFENDANTS AND THE ACURA

After Abarza parked, Chambers left his vehicle and approached the driver's side of the Acura.  Barden left his vehicle and walked to the passenger's side of the Acura to keep an eye on Dibrito.  Barden testified that Dibrito stared straight ahead, and appeared to be very tense.

During a normal stop for a traffic violation, Chambers testified that he would introduce himself to the driver, explain why he was there, and ask whether the driver had any legal justification for the violation. Here, Chambers did not tell Abarza why he had been pulled over. He also did not tell Abarza that the dash cam and body microphone would be recording the stop, although Oregon State Police policy ordinarily requires notification. Instead, the first thing Chambers said to Abarza was, "Let me see your hands." Chambers then asked, "What's going on?" Abarza responded that he had been trying to inflate a tire, stating he had just driven to two gas stations, including the Chevron station where Chambers first noticed the Acura, but neither station had a functioning air pump to inflate the tire. Chambers told Abarza that all of the Acura's tires appeared to be fully inflated. Abarza responded that he had used a product called "Fix-A-Flat" to inflate the tire temporarily.

After discussing the tire, Chambers asked Abarza, "How come you didn't pull over when I had my overhead lights on?" Abarza responded that he didn't see the lights, which Chambers considered to be a deceptive answer. In the context of the dash-cam video, Chambers's question is confusing. The dash-cam video shows Abarza reacting within a few seconds to the overhead lights.

About 2 minutes into the stop, Chambers asked for Abarza's driver's license, vehicle registration, and proof of insurance. Abarza said the car belonged to his wife, defendant Lisa Abarza. Abarza can be heard on the dash-cam audio rummaging in the glove compartment. He found the vehicle registration about 2 and 1/2 minutes into the stop. But Abarza had no proof of insurance or valid driver's license. He gave Chambers a California state identification card instead.

About 4 minutes into the stop, Chambers requested a license and records check on Abarza.  Chambers also requested the additional back-up of Trooper Irish to the scene.

Chambers recognized Dibrito as a local mixed-martial arts fighter, although he didn't remember Dibrito's name.  Chambers had been told by other law enforcement officers that Dibrito had served time in prison for an unspecified felony offense.  Dibrito was said to have been addicted to methamphetamine.

About 5 minutes into the stop, Chambers asked Barden, who was standing by the passenger window, "Sergeant, do you smell marijuana?"  There is no audible response from Barden.  Barden testified that he had nodded in agreement.  Chambers then stated, "I do too."

Abarza and Dibrito denied possessing or smoking marijuana.  When Abarza stated that he smoked cigarettes, Chambers said, "It's not cigarettes that I smell."

Chambers was then notified by dispatch that Abarza was on probation for a third-degree assault conviction, and that Abarza did not have a valid driver's license.  Abarza told Chambers that he was on bench probation.

About 6 and a  1/2 minutes into the stop, Chambers asked Abarza to step out of the car.  Chambers told Abarza that he would pat him down for weapons, describing the procedure.  Abarza denied having weapons.  Chambers then told Abarza, "Keep your hands where I can see them at all times."

Chambers testified that he told Abarza "to put his hands behind his back like he was praying and interlacing his fingers.  And I then asked him to spread his feet for the pat down.  And then I would have grabbed his hands as they were interlaced behind his back to control them.  It's called position of advantage."

While he had Abarza in the "position of advantage," and while conducting the pat-down, Chambers asked Abarza, "While I'm patting you down for weapons, can I search your pockets?" Abarza responded, "Uh, sure."

Chambers found no weapons or contraband during his search of Abarza's person.  He did find a total of about $1000 in cash from Abarza's pockets, which Chambers seized. He spent the next minute counting out the money in front of Abarza. Chambers repeatedly testified, despite prompting to the contrary from government counsel, that he had no belief that the money was connected to any criminal activity.  Abarza told Chambers that he had won about $300 at "King Falls," an establishment with lottery and video poker games.  As to the remaining cash, Abarza stated that he and his wife owned a cleaning business (the audio is not clear at this point). The seizure of the cash and the discussion regarding its acquisition were not reasonably related to the traffic stop or to officer safety.

At the hearing, Chambers did not remember whether he returned the cash to Abarza. Based on sequence of events shown by the dash-cam video, I find that Chambers did not return the money to Abarza.

During the search of Abarza's pockets, Chambers also found a store receipt for the purchase of Fix-A-Flat.  Abarza pointed to the receipt as proof he was truthful about trying to fix a tire.  The government did not preserve the receipt in evidence.

Around this time, Trooper Irish arrived on the scene in a marked cruiser.  Like Chambers and Barden, Irish was in uniform and armed.

About 11 minutes into the traffic stop, Chambers asked Abarza to stand with Irish, away from the Acura.  Abarza complied.  Chambers then told Abarza, "And you said I could search your vehicle and all its contents."  Abarza responded hesitantly, saying, "I mean . . . ."

Chambers stated, "That's what I'm asking for, can I search your vehicle and all its contents, yes or no?" Abarza answered, "Well, yeah. I'm not tripping or whatever." Chambers asked, "You're not what?" Abarza replied, "I said I'm not tripping."

At the hearing, I asked Chambers why he said Abarza had already agreed to the search, when this was Chambers's first request for consent to search the vehicle. Chambers responded that "a lot was going on during the traffic stop," and that because Abarza and Dibrito denied having marijuana, he "assumed that [he] had already obtained" Abarza's consent to search the car. I do not find this explanation entirely convincing, given Chambers's generally methodical approach, but certainly traffic stops are stressful for officers and citizens.

About 14 minutes into the stop, Chambers told Abarza that the troopers had found marijuana on Dibrito, and that Dibrito claimed the marijuana belonged to Abarza. Abarza sounded startled, stating he didn't know Dibrito had anything on him. Chambers responded, "Yeah, he said it's yours." Abarza said, "Why would he say that?" In fact, Chambers had fabricated the story about Dibrito in an attempt to get Abarza to reveal the presence of drugs. This fabrication, while an appropriate investigative tool in some cases, was not reasonably related to the traffic stop.

About 16 minutes into the stop, Chambers decided to remove Dibrito from the Acura and detain him while the vehicle was searched. Prior to removing Dibrito from the car, Chambers described to him in detail the removal and pat down procedure. Chambers warned Dibrito that the troopers would use force against him if he did not comply fully with every order.

Although the pat-down of Dibrito is not visible on the dash-cam video, the audio reflects that Dibrito was not fully compliant with the trooper's instructions and was placed in handcuffs. Dibrito then admitted that he had a knife in his back pocket. Chambers determined that the knife

PAGE 10 - ORDER

opened with centrifugal force.  Because Chambers had been informed that Dibrito had an unspecified felony conviction, Chambers concluded he had probable cause to arrest Dibrito for being a felon in possession of a restricted weapon. Chambers gave Dibrito *Miranda* warnings. For the remainder of the traffic stop, Dibrito stood in handcuffs next to Sgt. Barden.

Chambers then searched Abarza's car.  About 24 minutes into the stop, Chambers found a closed box that contained two chambers used for a vaporizer (a smoking device) but not the vaporizer itself.  Abarza told Chambers that the vaporizer belonged to his wife.  Chambers took one photograph of the vaporizer box, opened to show the two components and two empty compartments.  The government did not preserve the vaporizer box or its contents as evidence.

Chambers found no marijuana in the vaporizer box or anywhere else in the car during his ten-minute search of the Acura.  Chambers found nothing in the car to suggest criminal activity.

Despite the claim of an odor of marijuana, no marijuana was found in the car or on either of the occupants.  There is no evidence to suggest that Abarza or Dibrito had ingested marijuana or that, once removed from the car, either was the source of the alleged odor. Trooper Irish, who has specialized training in drug detection, testified that he had no reason to believe that Abarza or Dibrito had ingested marijuana.

As to the vaporizer parts found in a closed box in the car, Chambers testified that "I believe that this was the source of where the odor of marijuana that I detected coming from the vehicle was coming from." Interestingly, he neither smells the vaporizer box to confirm this nor does he bother to see if there is any type of residue in the vaporizer chambers that are found in the box.  Nor did he attempt to preserve the box in evidence.

Chambers, upon questioning by the court, admitted that "vaporizers are beyond me and I only knew it was a vaporizer because of what it says. I don't know how they work."  This may

explain why Chambers, in his affidavit in support of the search warrant, mistakenly describes what he found in the box as a "marijuana smoking device." In fact, the device that actually heats the marijuana, allowing it to be inhaled, is absent from the box, the car, and the occupants.

At 12:26 a.m., 37 minutes and 30 seconds into the stop, Chambers wrote the traffic citations for Abarza. He cited Abarza for "no operator's license," in violation of Or. Rev. Stat. § 807.010; "driving uninsured," in violation of Or. Rev. Stat. § 806.010; and "fail to signal for turn, lane change or stop," in violation of Or. Rev. Stat. § 811.400. These are class B traffic violations, not criminal offenses.

About 40 minutes into the traffic stop, Chambers searched Dibrito and found two one-ounce bags of methamphetamine and a loaded semi-automatic pistol that had been concealed in Dibrito's pant legs. Dibrito told Chambers that Abarza had handed him the drugs and the handgun when the car was pulled over. About 42 minutes into the traffic stop, Abarza was handcuffed. More than an hour and ten minutes after the initial traffic stop, Abarza was formally placed under arrest.

Based on the evidence obtained from the traffic stop, the troopers obtained a search warrant for the home where Abarza and Lisa Abarza lived.

## STANDARDS

The government bears the burden of proving by a preponderance of the evidence "that a warrantless search or seizure falls within an exception to the warrant requirement." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012).

## DISCUSSION

The reasonable duration of a traffic stop "is determined by the seizure's 'mission'--to address the traffic violation that warranted the stop, and attend to related safety concerns."

*Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citations omitted).  "Authority for the seizure thus ends when tasks tied to the traffic infraction are--or reasonably should have been--completed."  *Id.*  These tasks include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Id.* at 1615.  The officer may also "take certain negligibly burdensome precautions in order to complete his mission safely."  *Id.* at 1616.  But the officer may not prolong the stop further "absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  *Id.* at 1615 (eight-minute delay to perform dog sniff of vehicle violated Fourth Amendment unless supported by reasonable suspicion).

Here, the issue is whether the troopers unreasonably prolonged the traffic stop to search for evidence of other crimes after the investigation into the traffic violations should have been completed.  To justify the continuation of the stop, the government must show either that Abarza consented to the searches, or that the troopers had probable cause to search for evidence of other crimes.  I conclude that the government has failed to meet its burden on these issues.

## I.  There Was Reasonable Suspicion to Make the Initial Stop

Abarza contends that Chambers did not have reasonable suspicion to pull him over for the lane change violation.  "Reasonable suspicion 'exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion.'" *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015) (*Evans I*) (quoting *United States v. Montero-Carmargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc))(emphasis in the original).

Here, although the lane-change violation is not visible on the dash-cam video, based on his testimony I find that Chambers had sufficient reasonable suspicion to pull over Abarza for the lane-change violation.

**II.  Reasonable Suspicion to Pat Down Abarza for Weapons**

After determining that he smelled marijuana coming from inside the Acura, Chambers asked Abarza to exit the vehicle for a pat-down. Chambers justified the pat down search based on officer safety.  He testified that he believed Abarza was armed and dangerous based on "his level of nervousness and because of the way that they had pulled over. They had passed two reasonable spots to pull over and the movement that I had seen and I believed that he was being deceptive to me telling me . . . he was looking to get air for his tires, and I was concerned for my safety."

As previously discussed, the dash-cam video rebuts the contention that Abarza could have pulled over earlier.  The audio portion also reveals that Abarza's initial interaction with the officer is casual and conversational.  Chambers's belief that Abarza was being deceitful was less than fully developed in light of the Fix-a-Flat receipt that Abarza was found to have on his person.

Despite his overstatement of the facts, Chambers knew Abarza was on probation for third-degree assault.  Chambers considered Abarza's conduct before being pulled over to be suspicious, and saw furtive movement within the car while Abarza was pulling over.  Given the time of night and location of the traffic stop in a vacant parking lot, it was reasonable for Chambers to inquire as to weapons and conduct a pat-down search. The pat-down was further supported by the fact that Abarza was wearing a "pair of baggy pants and a large puffy coat."

"[A]n officer may conduct a brief pat-down (or frisk) of an individual when the officer reasonably believes that 'the persons with whom he is dealing may be armed and presently dangerous.'"  *United States v. I.E.V.*, 705 F.3d 430, 434 (9th Cir. 2012) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  In determining the constitutionality of a frisk or pat-down, the court asks "'whether the officer's action was justified at its inception'" and "whether the officer's action was 'confined in scope' by engaging in a 'carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault' an officer."  *Id.* at 435 (quoting *Terry*, 392 U.S. at 29-30).  "[T]he appropriate analysis is 'whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'"  *Id.* (quoting *Terry*, 392 U.S. at 27).

I find that under the totality of the circumstances, a reasonably prudent person could believe that Abarza might be armed.  *See Evans I*, 786 F.3d at 787 (noting that traffic stops are potentially dangerous to police officers).  I conclude that Chambers's pat-down did not violate Abarza's constitutional rights.

## III.  Abarza's Consent to Search His Person Was Not Voluntary.

During the pat-down, while he had Abarza in the "position of advantage," Chambers asked for consent to search Abarza's pockets.  Abarza said, "Uh, sure."

### A.  Legal Standards For Consent

The government has the burden of proving consent was freely and voluntarily given.  See *Florida v. Royer*, 460 U.S. 491, 497 (1983).  The government's burden "is not satisfied by showing a mere submission to a claim of lawful authority."  *Id.*  The court looks to the totality of the circumstances to determine whether consent was "'freely and intelligently given.'"  *United*

*States v. Basher*, 629 F.3d 1161, 1168 (9th Cir. 2011) (quoting *United States v. Reid*, 226 F.3d 1020, 1026 (9th Cir. 2000)).

The Ninth Circuit has instructed courts to consider five factors in this determination: (1) whether the defendant was in custody; (2) whether the arresting officer had his gun drawn; (3) whether the defendant was given *Miranda* warnings; (4) whether officers notified the defendant he had a right not to consent; and (5) whether the defendant was told officers could obtain a search warrant. *See United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002). No single factor is controlling. *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir. 1990).

**B. Discussion**

Here, I find that Abarza's consent to the search of his person was not voluntary. Chambers asserted his authority over Abarza starting with the first words he spoke to Abarza: "Let me see your hands." *See, e.g.*, *United States v. Manzo-Jurado*, 457 F.3d 928, 934 n.3 (9th Cir. 2006) (officer's order to occupants of a truck "to show their hands" was a seizure). Three troopers, with three patrol cars, controlled Abarza's movements. Abarza could not move without the troopers' permission.

Furthermore, Chambers asked Abarza for consent while Abarza was physically under his control during the pat-down. Although physical restraint does not necessarily preclude valid consent, I find that under these particular circumstances Abarza's consent was not freely given. "[T]he manner in which [the officer] searched [the defendant's] person was authoritative and implied that [the defendant] was 'not free to decline his requests.'" *United States v. Washington*, 490 F.3d 765, 772 (9th Cir. 2007) (quoting *Orhorhaghe v. INS*, 38 F.3d 488, 495 (9th Cir. 1994)). I find that a reasonable person who is placed in a control hold by the searching officer while being patted down for weapons would reasonably conclude he was already being searched,

with or without consent. Although the terms "pat-down" and "search" have discrete meanings to those with legal training, it is not reasonable to assume that a citizen would understand that the very search for which the officer is asking consent was not the search already in progress.

Turning to the other factors, the troopers did not have their guns drawn, although their guns were visible. Abarza was not given *Miranda* warnings and he was not told he had a right to refuse consent. The government notes that after Abarza was handcuffed, he refused to consent to a search of his cell phone, saying that it contained private photos. Even if this factor slightly favors the government, it does not outweigh the degree of control over Abarza that Chambers exercised.

Abarza was not told that the troopers could obtain a search warrant if he refused to consent. This factor weighs also weighs in Abarza's favor. Under the totality of the circumstances, I find that Abarza's consent to the search of his person was not voluntary. This finding is relevant to the next issue, whether Abarza's subsequent consent to search the car was voluntary.

## IV. Abarza's Consent to Search the Car Was Not Voluntary

Chambers asked Abarza for consent to search the car by initially implying that Abarza had already consented. Consent should not be the product of confusion; it is of little import whether that confusion is the product of understandable negligence by law enforcement or clever trickery. Either way, it undermines that notion that the consent here was made knowingly and voluntarily as a product of free will.

By the time Chambers asked Abarza for consent to search the car, the third trooper, Irish, had arrived. Chambers had previously taken Abarza's California identification. Chambers had just searched Abarza and seized $1,000 in cash from him. This action alone unreasonably

extended the scope of the traffic stop and was unrelated to officer safety. There is simply no justification in the record for retaining Abarza's money when the very trooper who was retaining it testified that he did not believe it was related to any criminal activity. A reasonable person, in this situation, could feel extorted into acquiescence. "When a law enforcement official retains control of a person's identification papers, such as vehicle registration documents or a driver's license, longer than necessary to ascertain that everything is in order, and initiates further inquiry while holding on to the needed papers, a reasonable person would not feel free to depart." *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997).

In addition, the previous illegal search of Abarza's person taints the subsequent consent to search the car. *See Washington*, 490 F.3d at 776-77. Under the totality of the circumstances, I find that Abarza's consent to the search of the Acura was not voluntary. *See United States v. Hight*, Case No. 15-cr-00060-LTB, 2015 WL 4239003, at *6 (D. Colo. June 29, 2015) (finding consent to search invalid when "there was an implied, but pervasive, element of coercion that led Defendant to provide his consent").

## V.  No Reasonable Suspicion to Prolong the Traffic Stop

Even though Abarza's consent to search the Acura was not voluntary, the troopers could prolong the traffic stop if they had reasonable suspicion that they would find evidence of other crimes. In determining whether reasonable suspicion exists, the court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (citations and quotation marks omitted).

To search the car without Abarza's consent, the troopers needed to show that they had probable cause, a higher standard than reasonable suspicion, to believe that the car contained

contraband or other evidence. *See United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008).

Probable cause exists when "the known facts and circumstances are sufficient to warrant a man

of reasonable prudence in the belief that contraband or evidence of a crime will be found."

*Ornelas v. United States*, 517 U.S. 690, 696 (1996) (citation omitted).

Here, to show reasonable suspicion to prolong the traffic stop, Chambers testified he

relied on "the smell of marijuana," the Acura's presence in a "high-crime area," Abarza's

"response to the overhead lights coming on and the furtive movements," and Abarza's

association with Dibrito.

### A.  The Smell of Marijuana

About 5 minutes into the traffic stop, Chambers stated that he smelled marijuana.  At the

hearing, Chambers testified that he knows what marijuana smells like from his extensive

experience in drug investigations.  He testified that the smell "was easily detected as marijuana."

But Chambers also testified, "I don't remember today if it was burned marijuana or green

marijuana." At the hearing, Chambers described the smell coming from the car as "detectable."

Although Barden testified that he also smelled marijuana, he did not mention marijuana

in his report of the incident.  At the hearing, Barden testified that the smell was "just a light odor

of marijuana."  Later in the hearing, Barden described the odor as "faint."

 In his affidavit in support of the search warrant obtained a few hours after the traffic

stop, Chambers stated that the vaporizer "smelled strongly of marijuana." At the hearing, he

merely asserted, "I believe that this [i.e., the vaporizer] was the source of where the odor of the

marijuana that I detected coming from the vehicle was coming from."

Chambers testified that he did not consider seizing the vaporizer box because he did not

find anything that could have been evidence of a crime or violation.  The government did not

preserve the vaporizer box in evidence, and the government has the burden of showing reasonable suspicion existed. Without the vaporizer box in evidence, Chambers's statement is impossible to verify. Given that Chambers found no trace of marijuana, and that the photograph indicates the box did not contain the actual vaporizer itself, I find it doubtful that the box would have smelled, strongly or not, of marijuana. Chambers testified that he knew nothing about vaporizers, and that he "knew it was a vaporizer [only] because of what [the box] says."

The government has not presented any evidence of marijuana use other than the vaporizer box. There is no evidence that either Abarza or Dibrito appeared to have ingested marijuana or that their clothes smelled of marijuana smoke. The government does note that what appeared to be several ounces of marijuana were found in a safe in the Abarzas' home. This is consistent with Abarza's statement that the vaporizer belonged to his wife, and it does not justify a search of the Acura for evidence of marijuana crimes. I conclude that Chambers lacked reasonable suspicion, much less probable cause, to search the Acura for evidence of a marijuana crime. *See, e.g.*, *United States v. Crain*, Case No. 10-428-HA, 2011 WL 2036480, at *3-4 (D. Or. May 23, 2011) (officers lacked probable cause to search car despite assertion that there was a "strong odor of marijuana"); *Evans II*, 2015 WL 4711148, at *5 (odor of methamphetamine was not sufficient to show reasonable suspicion).

### B. Other Factors Do Not Support Reasonable Suspicion

Other factors mentioned by Chambers as supporting reasonable suspicion fall short. I have found that Abarza was not in a "high-crime area." I have also found that the government failed to show that Abarza's "response to the overhead lights coming on" was suspicious. I have noted that a citizen's nervousness during a traffic stop, without more, is not grounds for reasonable suspicion. In a similar context, this court noted that the demeanor of passengers, who

"remained quiet and still," "will not be construed as a legitimate basis for conducting a search, even though both officers testified that the passengers' conduct was abnormal." *Crain*, 2011 WL 2036480 at *4; *Evans II*, 2015 WL 4711148, at *6 (passenger who pretended to sleep did not establish reasonable suspicion). I do not find that Abarza's association with Dibrito could give rise to reasonable suspicion sufficient to justify prolonging the stop. The furtive movements Chambers observed in the Acura are relevant to reasonable suspicion and officer safety, but in light of all the other circumstances, furtive movements alone are not sufficient for the continuing the stop for as long as the troopers did here.

Under these facts, I conclude that there was no reasonable suspicion to prolong the traffic stop. In light of the troopers' testimony that the smell of marijuana was "light," "detectable," and "faint," I find it relevant that under Oregon law at the time, as Chambers recognized, possession of less than an ounce of marijuana would be a simple violation, similar in seriousness to the traffic violations for which Chambers cited Abarza.

I conclude that the troopers here prolonged the traffic stop beyond the time required to resolve the traffic violations. I find that the troopers could have easily completed their traffic violation investigation within ten minutes, yet they prolonged the stop for another thirty minutes. Although Abarza could not have legally driven away without a driver's license or proof of insurance, that fact would not allow the troopers to prolong the stop to search for evidence of other unrelated crimes. In *Rodriguez*, an eight-minute delay was sufficient to show a Fourth Amendment violation. Here, the delay was much longer between when the traffic investigation should have been completed and when Abarza was arrested.

PAGE 21 - ORDER

The troopers lacked reasonable suspicion to continue the stop, and Abarza's consent to the search of his person and of the car was not voluntary.  I therefore grant the motions to suppress.

## CONCLUSION

Defendants' motions to suppress (##73, 81) are granted.

IT IS SO ORDERED.

DATED this 6th day of November, 2015.


   /s/Michael McShane
MICHAEL MCSHANE
United States District Judge