IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

GIOVANNI FRANCISCO ABARZA,
JOSEPH SANTINO DIBRITO, LISA
RENEE ABARZA,

        Defendants.

No. 1:14-cr-179-MC

**ORDER**

**MCSHANE, J.**

I previously granted defendant Giovani Abarza's Motion to Suppress, finding that Oregon State Police troopers unreasonably prolonged the traffic stop of Mr. Abarza in violation of his Fourth Amendment right to be free from unreasonable searches and seizures. *United States v. Abarza*, 143 F. Supp. 3d 1082 (D. Or. 2015). The government now moves for reconsideration or clarification of that order, contending that evidence seized from Mr. Abarza's passenger, defendant Joseph Dibrito, should not be suppressed.

PAGE 1 - ORDER

Defendant Lisa Abarza (Ms. Abarza), Mr. Abarza's wife, subsequently moved to suppress statements she made to Oregon State Police troopers at the Abarzas' residence following her husband's arrest. Mr. Abarza joins in her motion.

I grant the government's motion to clarify the extent of the prior suppression order. All evidence seized from Mr. Abarza and his vehicle remains suppressed. Because Mr. Abarza does not have standing to challenge the search of his passenger in this case, I conclude that the search of Mr. Dibrito did not violate Mr. Abarza's Fourth Amendment rights. Evidence seized from Mr. Debrito is not suppressed.

Because the warrantless entry into the curtilage of the Abarza home by state troopers was made in violation of her Fourth Amendment rights, I grant Ms. Abarza's motion to suppress the statements she made to Oregon State Police troopers.

Finally, I conclude that even if the evidence and statements obtained from Mr. Dibrito are not suppressed, that evidence alone presents insufficient probable cause to support the issuance of the warrant authorizing the search of the Abarza home.

## THE GOVERNMENT'S MOTION TO RECONSIDER OR CLARIFY

### I. Prior Findings on Mr. Dibrito's Arrest

In the previous opinion, I made the following findings as to the arrest of Mr. Dibrito during the traffic stop of Mr. Abarza's vehicle:

> About 16 minutes into the stop, [Oregon State Police trooper David] Chambers decided to remove Dibrito from the Acura and detain him while the vehicle was searched. Prior to removing Dibrito from the car, Chambers described to him in detail the removal and pat down procedure. Chambers warned Dibrito that the troopers would use force against him if he did not comply fully with every order.
>
> Although the pat-down of Dibrito is not visible on the dash-cam video, the audio reflects that Dibrito was not fully compliant with the trooper's instructions and was placed in handcuffs. Dibrito then admitted that he had a knife in his back pocket. Chambers determined that the knife opened with centrifugal force. Because Chambers had been

> informed that Dibrito had an unspecified felony conviction, Chambers concluded he had probable cause to arrest Dibrito for being a felon in possession of a restricted weapon. Chambers gave Dibrito *Miranda* warnings. For the remainder of the traffic stop, Dibrito stood in handcuffs next to Sgt. Barden.
>
> . . . .
>
> About 40 minutes into the traffic stop, Chambers searched Dibrito and found two one-ounce bags of methamphetamine and a loaded semi-automatic pistol that had been concealed in Dibrito's pant legs. Dibrito told Chambers that Abarza had handed him the drugs and the handgun when the car was pulled over.

*Abarza*, 143 F. Supp. 3d at 1090-91.

## II. The Search of Mr. Dibrito Did Not Violate Mr. Abarza's Fourth Amendment Rights

When the government illegally seizes evidence from a criminal defendant, the exclusionary rule generally "requires trial courts to exclude unlawfully seized evidence in a criminal trial." *Utah v. Strieff*, ___ U.S. ____, 136 S. Ct. 2056, 2061 (2016). For purposes of this motion to reconsider, the government does not dispute that the exclusionary rule requires suppression of evidence seized from Mr. Abarza during the illegal search of his car. The government argues, rather, that this court's order granting Mr. Abarza's motion to suppress does not apply to evidence and statements from Mr. Dibrito because Mr. Abarza cannot assert Mr. Dibrito's Fourth Amendment rights to be free from unlawful searches and seizures.

Mr. Abarza responds that the evidence seized from Mr. Dibrito must be suppressed because the search of Mr. Dibrito was a direct result of the illegal search of Mr. Abarza's car. Under the "fruit of the poisonous tree" doctrine, the exclusionary rule "require[s] suppression of other evidence that is derived from—and is thus tainted by—the illegal search or seizure." *Lingo v. City of Salem*, ___ F.3d _____, No. 14-35344, 2016 WL 3525209 at *3 (9th Cir. June 27, 2016).

I conclude that this court is bound by the Ninth Circuit's holding in *United States v. Kuespert*, 773 F.2d 1066 (9th Cir. 1985). There, police officers illegally stopped a vehicle driven

PAGE 3 - ORDER

by defendant Kuespert. The officers found stolen United States Treasury checks in the waistband of one of Kuespert's passengers and Kuespert's fingerprints were found on the stolen checks. The District Court granted the passenger's motion to suppress the stolen checks, but denied Kuespert's motion to suppress. Kuespert subsequently entered a provisional plea of guilty and appealed the denial of his motion.

On appeal, the Ninth Circuit affirmed, holding that "although Kuespert, as the driver of the vehicle, may have standing[1] to challenge the search of the car, this does not encompass the search of its passengers as well." *Kuespert*, 773 F.2d at 1068 (citation omitted).

There is no legally significant distinction between Kuespert's situation (the driver of an illegally stopped car attempting to suppress evidence seized from a passenger) and that of Mr. Abarza. I conclude that Mr. Abarza, under the facts presented here, cannot challenge the search of Mr. Debrito. Evidence seized from Mr. Dibrito is therefore admissible.

## MS. ABARZA'S MOTION TO SUPPRESS

### I. Background

The following background facts are taken from the parties' joint stipulation, ECF No. 134; the declarations of Oregon State Police troopers Chambers and Patrick Irish, ECF No. 141-1, -2; and the photographs and other exhibits submitted by the parties, including video from the Abarzas' home security cameras, Gov't Supp. Resp., Exs. 8 and 9, ECF Nos. 141-10, -11.

After his arrest following the illegal traffic stop, Mr. Abarza was taken to the Klamath County Jail where he was booked around 1:00 a.m.. While inventorying the contents of Mr.

---

[1] "The 'standing' inquiry, in the Fourth Amendment context, is shorthand for the determination of whether a litigant's Fourth Amendment rights have been implicated." *United States v. Mosley*, 454 F.3d 249, 253 n.5 (3d Cir. 2006). Courts still refer to "standing" to bring a motion to suppress even though "[t]echnically, the concept of 'standing' has not had a place in Fourth Amendment jurisprudence" since *Rakas v. Illinois*, 439 U.S. 128 (1978), held that the issue was one of substantive Fourth Amendment law. *Id.* (quoting *United States v. Sanchez*, 943 F.2d 110, 113 n.1 (1st Cir. 1991) (further quotation marks omitted)).

PAGE 4 - ORDER

Abarza's wallet, Chambers seized a receipt for $300 from a Sacramento, California business that sold keys, locks, and safes.

Chambers decided to go to the Abarzas' residence immediately. Chambers already had obtained Mr. Abarza's home address more than 35 minutes into the traffic stop. Chambers now states that if he had not obtained Mr. Abarza's home address during the unreasonably prolonged traffic stop, he "would have completed additional investigation and determined where [Mr. Abarza] lived in an attempt to obtain additional evidence." Chambers Decl. 1, ECF No. 141-1. This speculative belief that further investigation would have yielded additional evidence does not rise to the level of inevitability. Mr. Abarza's address and the receipt found in his wallet were obtained in exploitation of the illegal traffic stop.

Chambers and Irish arrived at the Abarzas' residence about 2:30 a.m. on March 7, 2014, driving separate Oregon State Police vehicles. The troopers were in full uniform and wore holstered handguns. Because of pitch dark conditions, each trooper carried an illuminated flashlight when they left their vehicles.

The Abarzas lived in a double-wide manufactured house. Video captures the troopers' approach to the Abarzas' house from the security surveillance cameras installed by the Abarzas at each door. Jt. Stip. 2.

The surveillance video shows the troopers walking towards the gate to the Abarzas' carport, stopping for a few seconds, and shining their flashlights on the enclosed space. No lights are visible from the house other than one porch light above the back door. Chambers walks towards the front door, which is enclosed by a three-foot high chain link fence. He opens the closed fence gate and knocks on the front door. Receiving no response, Chambers walks to

PAGE 5 - ORDER

the other side of the house, towards a covered carport. Going through another closed fence gate, he approaches the back door and knocks.

The government now contends, contrary to the parties' Joint Stipulation, that the two exterior doors to the Abarzas' house were not front and back doors, but simply two side doors. I agree with Defendants that the evidence confirms the Joint Stipulation's characterization of the doors. The surveillance video shows "the officers believed that the most appropriate door to contact the occupants of the dwelling was the first door that they approached—the front door on the left side of the house—not the right door, which was behind a gate that is flush with the exterior of the residence, and enclosed within a carport containing personal belongings and a motorcycle." Def. Mem. in Opp. 4-5, ECF No. 142. The area around the front door is clear of debris, in contrast to the area around the back door, which appears to be in a private area cluttered with piles of cardboard boxes on either side of the door, as well as a motorcycle and furniture.[2]

About 10 seconds after Chambers knocked on the back door, Ms. Abarza answered the door. She spoke briefly to Chambers, who was carrying a lit flashlight, and then let him enter the house. Chambers could see that Ms. Abarza had just awakened.

Chambers now states that even though Ms. Abarza had just awakened, she appeared to be alert and coherent. Chambers states that Ms. Abarza was cordial and did not appear to be under the influence of any intoxicants.

---

[2] In any event, my ruling that the troopers acted illegally does not depend on the whether the troopers entered through the back door or a side door. *See United States v. Lundin*, 817 F.3d 1151, 1159, (9th Cir. 2016) ("the front porch of a home is the 'classic exemplar' of curtilage") (quoting *Florida v. Jardines*, ____U.S. ____, 133 S. Ct. 1409, 1415 (2013)).

Once inside the house, Chambers asked Ms. Abarza about the receipt he had illegally seized from Mr. Abarza's wallet. She said Mr. Abarza had purchased a safe for her in Sacramento the day before.

Chambers then told Ms. Abarza that Mr. Abarza had just been arrested for possession of methamphetamine and a firearm. Ms. Abarza then made a series of incriminating statements in response to Chambers's questions. She said Mr. Abarza would have been carrying a "baby 40," a compact .40 caliber pistol that he had purchased for her. She said she usually stored the pistol under the mattress in their bedroom. She said there was a pistol in Mr. Abarza's nightstand and another firearm in the bedroom closet.

Chambers asked Ms. Abarza if there was any methamphetamine in the house. She said she had a small amount of methamphetamine in her nightstand. She admitted to being a methamphetamine user but denied being a dealer.

Chambers asked for consent to search the house. Ms. Abarza denied consent, stating that Mr. Abarza would retaliate against her if he learned that she had cooperated with law enforcement.

Chambers left to obtain a search warrant. Irish remained at the house. A search warrant was issued later based on an affidavit from Chambers.

## II. The Officers Violated the Abarzas' Fourth Amendment Rights

The Fourth Amendment, at its "very core," protects the right of a person "to retreat into his own home and there be free from unreasonable governmental intrusion." *United States v. Lundin*, 817 F.3d 1151, 1157 (9th Cir. 2016) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961) (quotation marks omitted)). "The area 'immediately surrounding and associated with the home'—the 'curtilage'—is treated as 'part of [the] home itself for Fourth Amendment

purposes.'" *Id.* at 1158 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). If the law did not protect the curtilage, the Fourth Amendment's protection of the home from warrantless searches and seizures "'would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity.'" *Id.* (quoting *Florida v. Jardines*, ___ U.S. ____, 133 S. Ct. 1409, 1414 (2013)). Here, the troopers' warrantless intrusion into the curtilage of the Abarzas' house was presumptively unreasonable.

The government argues that the troopers' warrantless intrusion into the curtilage was legal under the "so-called 'knock and talk' exception to the warrant requirement, which permits law enforcement officers to 'encroach upon the curtilage of a home for the purpose of asking questions of the occupants.'" *Id.* at 1158 (*quoting United States v. Perea-Rey*, 680 F.3d 1179, 1187 (9th Cir. 2012) (further citation and quotation marks omitted)). The government contends that the troopers "did nothing more than any member of the public might have done to contact the residents." Gov't Supp. Resp. 6, ECF No. 141. The government argues that the time of the confrontation with Ms. Abarza is not relevant.

I disagree with the government's argument. The time of day that an officer attempts to contact a resident is one of several facts relevant to reasonableness. The Ninth Circuit recently noted that "unexpected visitors are customarily expected to knock on the front door of a home only during normal waking hours." *Lundin,* at 1159. Although a home visit before or after normal waking hours could be reasonable under certain circumstances, no such circumstances are present here. *See id.* (police officers might reasonably believe, e.g., that a resident who sells fresh croissants from his home would expect early morning visitors on his front porch). Turning to the undisputed facts here, I know of no residential neighborhood where it would be considered normal or reasonable for unannounced visitors to approach darkened houses after midnight,

PAGE 8 - ORDER

carrying flashlights and knocking on back doors. As Ms. Abarza argues, "most people awakened at 2:30 in the morning, viewing someone lurking outside their home using a flashlight going from front to rear of the house, would immediately call 911; others would grab a shotgun, shoot first, and ask questions later." Mot.Suppress 10, ECF No. 119.

I recently addressed a similar, though less egregious, illegal police intrusion in *Lingo v. City of Salem*, a civil rights action. No. 6:12-cv-01019-MC, 2014 WL 1347468 (D. Or. April 4, 2014), *aff'd*, ___ F.3d ___, No. 14-35344, 2016 WL 3525209 (9th Cir. June 27, 2016). There, a police officer visited Lia Lingo's house at 10:00 p.m. to discuss a dispute between Lingo and a neighbor. The officer entered Lingo's carport and knocked on the rear door of the house. When an acquaintance of Lingo answered the door, the officer smelled the odor of marijuana emanating from the house. Lingo then went outside and told the officer that the odor was from a hemp-scented candle, not marijuana. Lingo refused the officer's repeated requests to enter the house. Lingo was later arrested for endangering the welfare of her two minor children, who were living in the house. After charges were brought against her in state court, Lingo successfully moved to suppress evidence from the house, including 1.8 grams of suspected marijuana.

Lingo then brought a civil rights action challenging the officer's entry into her carport. After concluding that the carport was part of the house's curtilage, I determined that the officer's warrantless "presence at the back door was not 'objectively reasonable as part of a knock and talk.'" *Lingo,* 2014 WL 1347468, at *7 (quoting *Perea-Rey*, 680 F.3d at 1188). Although the back door was arguably accessible from the driveway, and a rear outside light was on, those facts were outweighed by the lateness of the officer's entry, the limited visibility, and the presence of household items and a parked car and trailer in the carport. The officer's intrusion was illegal because "[a]n uninvited private citizen, let alone a Girl Scout or trick-or-treater, would not

objectively and reasonably believe that plaintiffs had given 'leave (even implicitly)' to enter the carport under such circumstances." *Id.* at *8 (quoting *Jardines*, 133 S. Ct. at 1416).

The same reasoning applies here. The troopers entered the curtilage of the Abarzas' house when they opened the gate and walked towards the back door, an area that was not set up for public entry but for private use. The troopers approached at a time when no homeowner would expect an uninvited visitor. A police officer's entry into the curtilage of a home late at night without probable cause, a valid warrant, or an express invitation from the occupant, violates the Fourth Amendment. Mot. Suppress 9, ECF No. 119 (citing *Jardines*, 133 S. Ct. at 1414, 1422).

The government argues that even if the troopers illegally entered the curtilage, Ms. Abarza's motion to suppress should be denied because she consented to Chambers's entry into the house. But even assuming Ms. Abarza's consent was voluntary for Fifth Amendment purposes, her consent was fatally tainted by the illegal entry that occurred immediately prior. *See United States v. Washington*, 387 F.3d 1060, 1072 (9th Cir. 2004) (although the defendant signed a consent form, the consent was invalid because it was tainted by illegal conduct). "Under the Fourth Amendment . . . evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding . . . consent, unless subsequent events have purged the taint." *Id.* (quoting *United States v. Bautista*, 362 F.3d 584, 592 (9th Cir. 2004) (further citations and quotation marks omitted)). Tainted evidence may be admitted if the evidence is sufficiently attenuated from the illegal activity. *Wong Sun v. United States,* 371 U.S. 471, 487–88 (1963). To determine attenuation, the court considers: (1) the temporal proximity between the illegality and the discovery of evidence, (2) the presence of any intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *United States v.*

PAGE 10 - ORDER

*Washington,* 490 F.3d 765, 776–77 (9th Cir.2007) (citing *Brown v. Illinois,* 422 U.S. 590, 603–04 (1975)).  The government bears the burden to show admissibility of evidence.  *Id.*at 777.

Here, there were no intervening circumstances or delay that might purge the taint of the illegal conduct.  Chambers's "illegal entry and interrogation of Ms. Abarza was one continuous uninterrupted sequence of events." Reply to Gov't Resp. 2, ECF 140.  Ms. Arbarza's consent was fatally tainted by the illegal entry that immediately preceded it.  The official misconduct was blatant.  All evidence derived from the questioning of Ms. Abarza must be suppressed.

### III. The Redacted Affidavit Does Not Support Probable Cause

The affidavit submitted by Chambers in support of the search warrant contains multiple references to evidence tainted by the illegal searches.

> The mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant.  A reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant.

*United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987) (citing *United States v. Driver,* 776 F.2d 807 (9th Cir.1985)).  "Probable cause exists when 'the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" *Abarza*, 143 F. Supp.3d at 1095 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

Here, after the tainted evidence is redacted, the affidavit does not support probable cause.  Statements in the affidavit based on tainted evidence concern (1) the smell of marijuana allegedly detected during the traffic stop; (2) Mr. Abarza's possession of $1,000 in currency; (3) Mr. Abarza's consent to search the vehicle; (4) the vaporizer box; (5) Mr. Abarza's alleged statements during the search of the car; (6) evidence seized from Mr. Abarza's wallet, including

the receipt for the safe; (7) Mr. Abarza's address; and (8) all statements derived from the illegal questioning of Ms. Abarza. *See* Def. Resp. to Mot. Recons., Ex. 201, ECF No. 117-1 (copy of the Chamber search warrant affidavit supplemented with redactions and marginal notes).

The remaining statements consist of (1) Mr. Dibrito's extensive criminal history that includes assault and weapons-related offenses, and incarceration within the previous five years; (2) Mr. Dibrito's resistance to being frisked, pulling his hands apart; (3) Mr. Dibrito's possession of a concealed illegal knife in his back pocket; (4) Mr. Dibrito's possession of a loaded .40 caliber semi-automatic handgun, and two clear plastic bags containing about an ounce each of methamphetamine, concealed in his pant legs, (5) Mr. Dibrito's statements that Mr. Abarza gave him the gun and drugs to hide when the car was pulled over; (6) Mr. Dibrito's statement that Mr. Abarza's fingerprints would be found on the gun and the bags of drugs; (7) Mr. Dibrito's cell phone , which contained text messages associated with drug transactions; and (8) Mr. Dibrito's statement that he was a drug addict.

No reasonable magistrate could conclude that the affidavit as redacted could support probable cause to search Mr. Abarza's house. When Mr. Abarza's car was stopped, Mr. Dibrito, an admitted drug addict with a violent criminal history, was found to be in possession of a concealed illegal knife. When Mr. Dibrito was later found with a gun and drugs hidden in his pant legs, he denied responsibility and blamed Mr. Abarza, but Mr. Dibrito's own cell phone contained texts indicative of drug dealing. On the other hand, there is no evidence linking to Mr. Abarza to the gun and drugs other than Mr. Dibrito's accusations and the fact that Mr. Dibrito was his passenger. I agree with Ms. Abarza that "the self-serving accusations of a desperate man like Mr. Dibrito" are inherently unreliable. Mr. Debrito cannot, under any analysis, meet the

requirements of a reliable informant. Mot. Suppress 12, ECF No. 119. I conclude that all evidence derived from the search of the Abarzas' residence must be suppressed.

## CONCLUSION

The Abarzas' motions to suppress (#119, #136), and the government's motion for reconsideration or clarification (#109) are granted.

IT IS SO ORDERED.

DATED this 5th day of August, 2016.

_____/s/_____  
MICHAEL MCSHANE  
United States District Judge
